Carrie J. COX, for Michael K. Cox, S.S. # 258–78–8869, Plaintiff-Appellant,

v.

Richard S. SCHWEIKER, Secretary of Health and Human Services, Defendant-Appellee.

No. 80–7430.

United States Court of Appeals, Fifth Circuit.* Unit B

Aug. 30, 1982.

---

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Galis, Timmons & Quarterman, John W. Timmons, Jr., Athens, Ga., for plaintiff-appellant.

Amalia Meza, Charles Wolfinger, Jr., Legal Aid Soc. of San Diego, Inc., San Diego, Cal., amici curiae for Welfare Rights Organization of San Diego, Inc. and Deborah Slesnick.

Bernard E. Namie, Asst. U. S. Atty., Macon, Ga., Holly A. Grimes, Carl H. Harper, Regional Atty., Dept. of Health & Human Services, Atlanta, Ga., for defendant-appellee.

Before TUTTLE, KRAVITCH and JOHNSON, Circuit Judges.

TUTTLE, Circuit Judge:

In this case we are asked to determine whether the appellant Carrie J. Cox is entitled to receive federal Social Security survivor's benefits on behalf of her son Michael, based on the earnings record and insured status of the deceased father, James Appling. 42 U.S.C.A. § 402(d) (1974). Michael was born out of wedlock and was never legitimated under Georgia law during the life of his father. The appellant claims entitlement on the basis of evidence assertedly establishing Michael's financial dependency upon his father, as well as evidence of his father's written acknowledgment of paternity. 42 U.S.C.A. §§ 402(d)(3), 416(h)(3)(C) (1974). Alternatively, the appellant claims entitlement by virtue of the State of Georgia's inheritance statutes for illegitimate children in force at the time of the original application for benefits. 42 U.S.C.A. § 416(h)(2)(A) (1974); Ga.Code Ann. § 113–904, 74–101, 74–103 (1978). For the reasons that follow, we hold the appellant entitled to survivor's

benefits under the alternative involving Georgia's illegitimate inheritance laws.

## I.

On October 19, 1977, the appellant Ms. Carrie J. Cox filed an application for Social Security survivor's benefits on behalf of her son, Michael Cox, based on the earnings record of the child's deceased father, Mr. James Appling. The Secretary of HEW denied the application on December 8, 1977, and then again after reconsideration on March 24, 1978. The appellant subsequently requested a hearing before an administrative law judge ("ALJ") which was held on February 10, 1979, at the Bureau of Hearings and Appeals, Social Security Administration, in Athens, Georgia. Appearing and testifying at the hearing were the claimant, the parents of the deceased father, and the deceased's sister. The ALJ affirmed the Secretary's determination and denied the appellant's request. The appellant then appealed the decision to the federal district court for the middle district of Georgia, whereupon the court upheld the ALJ's determination on March 19, 1980. Ms. Cox then filed her timely appeal with this Court on May 21, 1980.

## II.

From the testimony of the various witnesses present at the administrative hearing, the ALJ ascertained the following set of facts. Appellant Carrie Cox began dating James Appling while they were college students in Fort Valley, Georgia. Ms. Cox got pregnant and returned to her mother's home in Madison, Georgia. On December 31, 1973, Michael Cox was born. Mr. Appling continued to live in Fort Valley with his parents while attending school, and later while working for a brewing company.

Mr. Appling and Ms. Cox continued to communicate before and after Michael was born. Just prior to his birth, Appling sent $400 to Ms. Cox to help cover hospital expenses. Around Easter time in 1973, Mr. Appling sent some clothing for the new baby. In August of 1973, Mr. Appling went to Madison where he and Ms. Cox had blood samples taken with the intent of getting married. Appling's older sister, Marie, subsequently dissuaded the couple from such a plan. During the following years, Appling and Cox saw one another a couple of times each year and communicated by phone several times. Then on September 17, 1977, Appling was killed in an automobile accident.

The ALJ made the following additional factual findings relevant to the issues in the case. Mr. Appling designated Michael Cox as the sole beneficiary on a life insurance policy carried for Appling by his employer, the Pabst Brewing Company. There was no indication on the policy of any blood relation between Appling and Michael Cox. Appling also mentioned young Michael in his diary, again without expressly acknowledging his relation to the child. Finally, in a local newspaper account of Appling's death, it was indicated that he had one surviving son living in Athens, Georgia.

The ALJ was satisfied that James Appling was the father of Michael Cox. The judge nevertheless denied survivor's benefits based on the absence of any firm evidence that Appling had acknowledged in writing his relation to Michael, or that he had been living with or contributing to the support of Michael at the time of his death.

## III.

The Federal Social Security Act provides survivor's benefits for the children of deceased wage earners. The baseline requirement is simply that the child be dependent upon the parent wage earner at the time of death.[1] This dependency requirement can be satisfied in several ways, not all of which include explicit demonstration of actual financial dependency. Thus, a child is

---

1. The statute grants benefits to:

 (d)(1) Every child (as defined in section 416(e) of this title) of an individual entitled to old-age or disability insurance benefits, or of an individual who dies a fully or currently insured individual, if such child—

 (C) was dependent upon such individual—
 (i) if such individual is living, at the time such application was filed,
 (ii) if such individual has died, at the time of such death.

 42 U.S.C.A. § 402(d)(1) (1974).

deemed dependent unless, at the time of death, he or she is not living with or being supported by the insured parent and he or she is neither legitimate nor adopted.[2] In this way, the Act deems all legitimate children dependent and thus eligible[3] for survivor's benefits based on the insured status of their deceased parent. Illegitimate children such as Michael Cox are not so lucky.

Nevertheless, there exist additional ways of establishing eligibility without proving actual dependency. For example, the Act provides that an individual will be deemed an eligible child if the deceased parent has

acknowledged in writing that the individual is in fact his or her child. 42 U.S.C.A. § 416(h)(3)(C) (1974). Similarly, if a court has decreed that the child is in fact the son or daughter of the insured individual, then the child is eligible. *Id.*[4]

Finally, the Act provides survivor's benefits to any individual who, under the laws of intestate succession in the state in which the insured individual was domiciled, would inherit the same as legitimate children in that state.[5] At the time Ms. Cox filed for benefits, Georgia intestacy law denied all rights of inheritance to illegitimate chil-

---

**2.** The statute in full reads:

> (3) A child shall be deemed dependent upon his father or adopting father or his mother or adopting mother at the time specified in paragraph (1)(C) of this subsection unless, at such time, such individual was not living with or contributing to the support of such child and—
>
> (A) such child is neither the legitimate nor adopted child of such individual, or
>
> (B) such child has been adopted by some other individual.
>
> For purposes of this paragraph, a child deemed to be a child of a fully or currently insured individual pursuant to section 416(h)(2)(B) or section 416(h)(3) of this title shall be deemed to be the legitimate child of such individual.

42 U.S.C.A. § 402(d)(3) (1974).

**3.** In point of fact the Act does not make eligible a legitimate child of an insured individual who is not living with or being supported by the individual and who has been adopted by some other individual. *See* 42 U.S.C.A. § 402(d)(3)(B) (1974).

**4.** The statute in full reads:

> (3) An applicant who is the son or daughter of a fully or currently insured individual but who is not (and is not deemed to be) the child of such insured individual under paragraph (2) of this subsection, shall nevertheless be deemed to be the child of such insured individual if:
>
> (C) In the case of a deceased individual—
> (i) such insured individual—
> (I) had acknowledged in writing that the applicant is his son or daughter,
> (II) had been decreed by a court to be the father of the applicant, or
> (III) had been ordered by a court to contribute to the support of the applicant because the applicant was his son or daughter,
>
> and such acknowledgment, court decree, or court order was made before the death of such insured individual.

42 U.S.C.A. § 416(h)(3) (1974).

It may be noted that this provision merely deems the described applicant a "child" and not necessarily a dependent child. Such children are nevertheless made eligible by virtue of the language in section 402(d)(3) deeming them legitimate children. *See* note 2 *supra.*

It will also be noted that section (h)(3) provides that if the Secretary is satisfied by the evidence presented that an insured individual is the father of the applicant child and the child is living with or being supported by the parent, then the child is eligible for benefits. 42 U.S.C.A. § 416(h)(3)(C)(ii).

**5.** The statute in full reads:

> (2)(A) In determining whether an applicant is the child or parent of a fully or currently insured individual for purposes of this subchapter, the Secretary shall apply such law as would be applied in determining the devolution of intestate personal property by the courts of the State in which such insured individual is domiciled at the time such applicant files application, or, if such insured individual is dead, by the courts of the State in which he was domiciled at the time of his death, or, if such insured individual is or was not so domiciled in any State, by the courts of the District of Columbia. Applicants who according to such law would have the same status relative to taking intestate personal property as a child or parent shall be deemed such.

42 U.S.C.A. § 416(h)(2)(A) (1974). The statute by its own terms merely indicates that children inheriting the same as legitimate children under state intestacy law shall be deemed the child of the insured individual. Once again, this does not necessarily satisfy the dependency requirement of the Act. The Court has determined, however, that a child qualifying for state inheritance rights is deemed a *legitimate* child under section (h)(2)(A) and is therefore by virtue of section 402(d)(3) an eligible recipient of survivor's benefits. *See Mathews v. Lucas,* 427 U.S.

dren.[6] Georgia law at that time also provided that an illegitimate child could be rendered legitimate, and therefore capable of inheriting the same as a legitimate child, if the mother married the putative father and such father recognized the child as his.[7] In addition, such a child could be rendered legitimate if the father petitioned the superior court for an order of legitimation.[8]

In 1980, the Georgia legislature substantially altered the inheritance rights of illegitimate children. Under the amended provisions of § 113–904, an illegitimate child may inherit in the same manner as legitimates if, during the lifetime of the father and after the conception of the child, a court of competent jurisdiction has declared

the child legitimate either by reason of the authority granted under § 74–103, or simply if the court establishes and enters an order declaring the paternity of the child.[9] In practical terms, the new law thus substantially expands an illegitimate child's ability to be rendered legitimate. While under the old laws a father had to be an integral participant in the proceeding whereby a child became legitimate, under the new law an illegitimate child may be rendered legitimate by virtue of his or her own initiating actions.

## IV.

The plaintiff argues that her son is eligible under any of three separate provisions

495, 499 n.2, 96 S.Ct. 2755, 2759 n.2, 49 L.Ed.2d 651 (1976).

**6.** The statute in full reads:
Bastards have no inheritable blood, except that given to them by express law. They may inherit from their mother, and from each other, children of the same mother, in the same manner as if legitimate. Legitimate and illegitimate children of the same mother shall inherit alike the estate of the mother. If a bastard dies leaving no issue or widow, his mother, brothers, and sisters shall inherit his estate equally. In distributions under this law the children of a deceased bastard shall represent the deceased parent.
Ga.Code Ann. § 113–904 (1975).

**7.** The statute in full reads:
All children born in wedlock, or within the usual period of gestation thereafter, are legitimate. The legitimacy of a child thus born may be disputed. Where possibility of access exists, except in cases of divorce from bed and board, the strong presumption is in favor of legitimacy, and the proof should be clear to establish the contrary. If pregnancy existed at the time of the marriage, and a divorce is sought and obtained on that ground, the child, though born in wedlock, is not legitimate. The marriage of the mother and reputed father of an illegitimate child, and the recognition of such child as his, shall render the child legitimate, and in such case the child shall immediately take the surname of his father.
Ga.Code Ann. § 74–101 (1975).

**8.** The statute in full reads:
A father of an illegitimate child may render the same legitimate by petitioning the superior court of the county of his residence, setting forth the name, age, and sex of such child, and also the name of the mother; and

if he desires the name changed, stating the new name, and praying the legitimation of such child. Of this application the mother, if alive, shall have notice. Upon such application, presented and filed, the court may pass an order declaring said child to be legitimate, and capable of inheriting from the father in the same manner as if born in lawful wedlock, and the name by which he or she shall be known.
Ga.Code Ann. § 74–103 (1975).

**9.** The new statute in full reads:
(a) Illegitimate children have no inheritable blood except that given to them by express law.
(b) An illegitimate child may inherit in the same manner as if legitimate from and through his mother, from and through the other children of the mother, and from and through any other maternal kin whether collateral or lineal.
(c) An illegitimate child may not inherit from or through his father or any paternal kin by reason of the paternal kinship unless during the lifetime of the father and after the conception of the child a court of competent jurisdiction has entered an order declaring the child to be legitimate under the authority of section 74–103 or such other authority as may be hereafter provided by law or a court of competent jurisdiction has otherwise entered a court order establishing the father of the illegitimate child. If such an order has been entered, an illegitimate child may inherit in the same manner as if legitimate from and through his father, from and through the other children of his father, and from and through any other paternal kin whether collateral or lineal.
(d) In distributions under this law, the children of a deceased illegitimate child shall represent the deceased parent.
Ga.Code Ann. § 113–904 (1980).

contained in the Act. In the first place, she asserts that there is sufficient evidence to indicate that Michael was dependent upon and supported by his father, James Appling, thus qualifying the child for benefits directly under 42 U.S.C.A. § 402(d)(1) (1974). The plaintiff also contends that Appling's entry into his diary, combined with the substantial evidence of Appling's public acknowledgment of paternity prior to his death, were sufficient to satisfy the Act's provision granting benefits where the deceased individual has acknowledged paternity in writing. *See* 42 U.S.C.A. § 416(h)(3)(C) (1974).

Finally, the plaintiff argues that Michael qualifies for benefits pursuant to the provision in the Act making reference to state intestacy law. *See* 42 U.S.C.A. § 416(h)(2)(A) (1974). This contention involves several steps of reasoning. First, the plaintiff contends that the relevant state law is the Georgia statute in force at the time she applied for benefits in October of 1977, rather than the law as amended in 1980 while this litigation was pending. Second, she argues that the former Georgia law is unconstitutional under principles set out in a case decided by the U. S. Supreme Court a few months prior to the time of her application. *See Trimble v. Gordon*, 430 U.S. 762, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977). Thus had a court sat in 1977 to determine Michael's status as an intestate successor, it would have had no constitutional basis for treating him any different from a legitimate child. Assuming paternity was established, then Michael would have been entitled to inherit as if he were a legitimate child. In essence then, the plaintiff is claiming that Michael had a right to inherit

the same as legitimate children, and under the relevant Social Security Act provision, he was therefore, at the time of his application, entitled to survivor's benefits.[10]

## V.

### A

■ We are satisfied that the evidence presented at the administrative hearing fails to establish Michael's eligibility either by virtue of his alleged dependency on James Appling, or by virtue of Appling's written acknowledgment of paternity. The Act expressly states that the child must be receiving support from the father "at the time of . . . [the insured's] death" in order to qualify as a dependent child. 42 U.S.C.A. § 402(d)(1)(C) (1974). Michael received from Appling a sum total of $400 and a few items of clothing, all within a year of his birth and several years prior to Appling's death. This evidence can in no way be viewed as sufficient under the relevant provisions in the Act requiring some showing of dependency at the time of death. No such evidence has been cited.[11] Even were we to call on our power to interpret the statute liberally in light of its spirit and purpose, *see United Steelworkers of America v. Weber*, 443 U.S. 193, 201, 99 S.Ct. 2721, 2726, 61 L.Ed.2d 480 (1979), we cannot evade the sheer linguistic certitude evinced by the plain language of the statute.

■ The same reasoning applies with equally critical force to the plaintiff's second contention involving a written acknowledgment of paternity. The simple fact is that Appling failed to acknowledge,

---

10. The plaintiff also attempts to argue that the Social Security Act itself unconstitutionally discriminates against illegitimate children by favoring legitimate children, all of whom are deemed dependent and are thus eligible simply by virtue of their status as legitimates. We are bound by the Supreme Court's decision in *Mathews v. Lucas*, 427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976), upholding the Act against just such a constitutional attack.

11. We do not intimate any view on the question whether Appling's designation of Michael

as a beneficiary on his life insurance policy satisfies the dependency requirement. The plaintiff raised this fact only as one possible indication of Appling's written acknowledgment, but no attempt was made to characterize it as a sign of dependency at the time of death. Because we have determined that Michael qualifies under a different argument affirmatively presented by the plaintiff, we see no reason to discuss the merits of this heretofore unmentioned proposition.

by his own hand, his paternity of Michael. The only personal writings of Appling's even mentioning Michael do not in any way suggest a father-son relationship.[12] On the other hand, the only written statement clearly testifying to Appling's blood relationship to Michael, namely, the newspaper obituary, was obviously not authored by Appling. None of the aforementioned writings satisfies the statutory requirement that the "insured individual—(I) had acknowledged in writing that the applicant is his son or daughter," 42 U.S.C.A. § 416(h)(3)(C)(i)(I), and thus benefits may not be awarded pursuant to that provision.

## B

■■■ The plaintiff's alternative contention that Michael is entitled to benefits based on the Act's provision referring to state intestacy law involves several interconnected issues, some of which we must address as a prelude to our discussion of the core issue of constitutionality. Obviously, at the outset, we must decide which Georgia law, the new law adopted in 1980, or the old one in effect at the time of application in 1977, is the appropriate one for our consideration. And even more fundamentally, we must initially determine whether under the Social Security Act, the question of the constitutionality of a state's intestacy law is even relevant to the assessment of eligibility for survivor's benefits. We turn first to these preliminary questions.

We are convinced that the structure and language of 42 U.S.C.A. § 416(h)(2)(A) of the Social Security Act, referring to state law on intestate inheritance, makes relevant the issue of the constitutionality of a particular state law. Of course, the issue of relevance turns on whether it makes any difference in the remedy if we are to hold the state law unconstitutional. When a statute conferring benefits on a certain class of persons is held unconstitutional due

to a violation of the equal protection clause, then the unlawful discrimination or classification must be eradicated, either by granting the benefits to the inappropriately excluded class, or by denying them to the class theretofore benefitted unlawfully. *Welsh v. United States*, 398 U.S. 333, 361, 90 S.Ct. 1792, 1807, 26 L.Ed.2d 308 (1970). In such cases where a sovereign has intentionally conferred some type of benefit upon one group and thereby unconstitutionally deprived another, the normal judicial remedy is to extend the benefits to the deprived group. *See Califano v. Westcott*, 443 U.S. 76, 99 S.Ct. 2655, 61 L.Ed.2d 382 (1979) (citing numerous other cases involving federal benefits statutes). Otherwise the result is an imposition of hardship on a number of persons whom the legislature intended to protect. *Id.* at 90, 99 S.Ct. at 2663.

Applying the above-stated principles in the present case, the benefit involved in Georgia's intestacy provisions concerns a child's ability to inherit from a father dying intestate. Were we to find Georgia's intestacy law unconstitutional, and extend the benefits to the illegally deprived class of illegitimate children, Michael Cox would thus be granted the benefits of inheriting the same as legitimate children in similar circumstances. Such a result certainly makes a difference in the outcome, for it would qualify him for survivor's benefits under section (h)(2)(A).

■■■ Our view is not undercut by the fact that section (h)(2)(A) refers to "such law as would be applied ... by the *courts of the State*...." and not to federal courts such as our own. The state courts of Georgia, no less than the courts of any other state, and of course no less than the federal courts, must adhere to the same fundamental constitutional principles by virtue of the Supremacy Clause of the federal constitution.[13] We must therefore assume that in

---

12. The life insurance policy designating Michael as the beneficiary does not even have a space requesting an indication of possible blood relation to the named beneficiary. The diary entry simply refers to Michael as a "pretty" kid.

13. The Supremacy Clause reads:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law

determining the rights of citizens under a particular state law, any court, state or federal, must give effect to federal constitutional principles where relevant.

In addition to the logical appeal of the foregoing propositions, we find support for our views in the case of *Mathews v. Lucas*, 427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976). In a footnote in that opinion the Court suggested that if a state intestacy law unconstitutionally discriminated against an illegitimate child applying for survivor's benefits, he or she would be eligible under section 416(h)(2)(A). *Id.* at 515 n.18, 96 S.Ct. at 2767 n.18.[14]

■ Moving on to the question of which Georgia law applies, we believe that Michael's status as a potential recipient of survivor's benefits was fixed at the time he applied, and that the relevant state law made applicable pursuant to section 416(h)(2)(A) is the law in force at the time of his application. Had this court been called upon to consider the plaintiff's eligibility back in 1977, we would have applied the old Georgia statute in force at that time. Although Georgia law has been subsequently amended, the issue continues to be, whether the Secretary erred in denying benefits to Michael Cox *at the time he applied.*

Common law and common sense dictate the view we adopt. Several courts have already held that the applicable law in such cases is the one in force at the time of application for benefits. In *Ramon v. Califano*, 493 F.Supp. 158 (W.D.Tex.1980), the court applied a section of the Texas Probate Code that had been superseded by an amended statute, but was the law in force when the plaintiff filed an application for benefits. In *Allen v. Califano*, 452 F.Supp. 205 (D.Md.1978), the court reached the same result, reasoning that the words contained in section 416(h)(2)(A) "at the time of his death" refer not only to the state of domicile of the deceased individual, but in addition refer to the law in force at a particular point in time. Finally, the court in *Florio v. Richardson*, 469 F.2d 803 (1972), determined that subsequent changes in the status of a child receiving Social Security benefits do not affect eligibility. The court held that once a child becomes eligible, the entitlement to benefits is fixed and can not be denied by virtue of any subsequent changes in either the child's circumstances or in the scope of the Act's provisions. *Id.* at 806. We find these cases amply supported by sound reason and we therefore adopt the position taken therein.

■ To hold otherwise would in effect amount to a retroactive interference with vested rights, a result expressly forbidden under Georgia constitutional law, *see Bullard v. Holman*, 184 Ga. 788, 193 S.E. 586 (1937) (enactments retroactively impairing vested rights are violative of Georgia Constitution, art. 1, § 3, par. 2), and viewed with suspicion and critical scrutiny by federal courts. *See Daughters of Miriam Center for the Aged v. Mathews*, 590 F.2d 1250 (3d Cir. 1978).[15] To avoid the unfairness often inherent in a retroactive statute, courts will normally presume that a legislative enactment is to apply prospectively from the date of enactment. *See U. S. v. Donnelly's Estate*, 387 U.S. 286, 90 S.Ct. 1033, 25 L.Ed.2d 312 (1970). The presumption obtains unless there is an unequivocal

---

of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.
U.S.Const. art. VI, cl. 2.

**14.** The footnote reads:

Appellees do not suggest, and we are unwilling to assume, that discrimination against children in appellees' class in state intestacy laws is constitutionally prohibited, see *Labine v. Vincent*, 401 U.S. 532 [91 S.Ct. 1017, 28 L.Ed.2d 288] (1971), in which case appellees would be made eligible for benefits under § 216(h)(2)(A).
*Mathews v. Lucas*, 427 U.S. 495, 515 n.18, 96 S.Ct. 2755, 2767 n.18, 49 L.Ed.2d 651 (1976).

**15.** Because we believe that retroactive application of the new Georgia law is inappropriate under both state and federal rules of statutory construction, we need not determine whether section 416(h)(2)(A) requires that the issue be decided according to state law or according to federal law. The result is the same in either case.

statutory directive mandating retroactive application. *Corpus v. Estelle*, 605 F.2d 175 (5th Cir.), *cert. denied*, 445 U.S. 919, 100 S.Ct. 1284, 63 L.Ed.2d 605 (1979); *International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers v. NLRB*, 316 F.2d 373 (D.C.Cir. 1963).

■ The Georgia statutes before us in this case contain no directives requiring retroactive application. Neither does the Social Security Act suggest that when applying section 416(h)(2)(A), the courts must rely on the most recent version of the applicable intestacy provisions. If anything, the words "at the time of death" suggest the contrary. *See Allen v. Califano, supra.* For these reasons, to determine eligibility under section 416(h)(2)(A), we will look to the Georgia law on intestate succession in force in 1977, at the time the plaintiff applied for benefits.[16]

■ We must address one final preliminary issue before turning to the constitutional question. The defendant asserts that the appropriate procedure for deciding the constitutional issue would be to certify the question to the attorney general of Georgia, and permit the state to intervene if desired, as provided in 28 U.S.C.A. § 2403(b).[17] This statute requires certification whenever the constitutionality of any state statute "affecting the public interest" is drawn into question in a federal court, and the state is not a party to the litigation. *Id.*

The present case does not come within the prescriptions of section 2403(b) because the constitutional issue involved is not one "affecting the public interest." The intestacy statute in force in 1977 is no longer on the Georgia books. Our determination as to its constitutionality will thus have little if any effect beyond the facts of the case under consideration, and therefore can in no way be said to be in the interest of the public-at-large. *See Keyes v. Madsen*, 179 F.2d 40 (D.C.Cir.1949) (matter of merely local interest does not trigger section 2403(b)). We see no additional prudential reason for requesting an opinion from the State of Georgia on the constitutionality of a now defunct state law, and so, with this extraordinarily long prelude behind us, we turn to the merits.

## VI.

### A

The Supreme Court has recognized the fundamental injustice in punishing the

---

**16.** The situation here is not analogous to that in *Maxey v. Freightliner Corp.*, 665 F.2d 1367 (5th Cir. 1982). That case was a diversity action brought by the children of parents killed in a freightliner accident. They sued on a theory of gross negligence on the part of the manufacturer of the cab. While the litigation was pending, the Texas Supreme Court altered the standard for gross negligence, and the court of appeals en banc adjudicated the suit in light of the new standard. *Id.* at 1374.

The cases differ in a fundamental way. In a case such as *Maxey*, one involving a judge-made common law principle, no rights vest nor even arise until a judge has declared what the law is. Thus a court adjudicating a case on the basis of common law rarely attempts to ascertain what the common law principles were at the time the cause of action arose, but rather applies the law as it presently stands in the relevant jurisdiction. In a case of statutory entitlement such as the one before us, the legislature has already established an entitlement, and the judge's role is merely to apply the law to a particular case. The entitlement vests once a person fulfills the statutory requirements, and it vests despite the fact that an adjudicator has misapplied the statute. Subsequent legislative amendments to these entitlements do not therefore affect prior vested rights unless the legislature so declares.

**17.** The statute in full reads:

(b) In any action, suit, or proceeding in a court of the United States to which a State or any agency, officer, or employee thereof is not a party, wherein the constitutionality of any statute of that State affecting the public interest is drawn in question, the court shall certify such fact to the attorney general of the State, and shall permit the State to intervene for presentation of evidence, if evidence is otherwise admissible in the case, and for argument on the question of constitutionality. The State shall, subject to the applicable provisions of law, have all the rights of a party and be subject to all liabilities of a party as to court costs to the extent necessary for a proper presentation of the facts and law relating to the question of constitutionality.

28 U.S.C.A. § 2403(b) (1978).

adult participants in illicit affairs by victimizing a blameless "illegitimate child:"

> The status of illegitimacy has expressed through the ages society's condemnation of irresponsible liaisons beyond the bonds of marriage. But visiting this condemnation on the head of an infant is illogical and unjust. Moreover, imposing disabilities on the illegitimate child is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing. Obviously, no child is responsible for his birth and penalizing the illegitimate child is an ineffectual—as well as an unjust—way of deterring the parent.

*Weber v. Aetna Casualty*, 406 U.S. 164, 175, 92 S.Ct. 1400, 1406, 31 L.Ed.2d 768 (1972) (footnote omitted). Despite such eloquent expressions of mercy, the Court has not seen fit to declare unconstitutional all discriminatory treatment of illegitimate children. And, in fact, most states deny illegitimates the right to inherit from an intestate parent absent some formal proof of paternity, usually by means of a judicial determination.

■ Nevertheless, because the burden of such discriminations falls upon the shoulders of an innocent class, the Court has subjected them to a standard of review that is more exacting than a rational relations test, although not rising to the level of a strict scrutiny review. *Trimble v. Gordon*, 430 U.S. 762, 767, 97 S.Ct. 1459, 1463, 52 L.Ed.2d 31 (1977). One recent enunciation of the test is whether the discriminatory law bears "an evident and substantial relation to the particular state interests [the state statute] is designed to serve," *Lalli v. Lalli*, 439 U.S. 259, 266, 268, 99 S.Ct. 518, 523, 524, 58 L.Ed.2d 503 (1978). Even more recently the Court in *Mills v. Habluetzel*, —— U.S. ——, 102 S.Ct. 1549, 71 L.Ed.2d 770 (1982), declared classifications against illegitimates valid only "to the extent they are substantially related to a legitimate state interest." *Id.* at ——, 102 S.Ct. at 1554.

If, as Justice Holmes once declared, "a word is the skin of a living thought," *Towne v. Eisner*, 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372 (1918), then surely the thought behind the words in the above-stated constitutional test is somewhat thick-skinned. The nature of the state interest and the degree of substantiality between means and ends required under the test are not precisely defined. Some general principles, however, may be derived from the various decisions of the Court applying the test.

With regard to the state purpose, the Court has upheld statutes designed to foster an efficient system of disposing of a deceased person's property. The Court in *Lalli* held that the state could constitutionally protect against the risk of spurious claims in intestacy proceedings by requiring that alleged illegitimate children obtain a judicial order of paternity during the lifetime of the father as a precondition to inheritance. *Lalli v. Lalli*, 439 U.S. at 268, 275–76, 99 S.Ct. at 524, 528–29. On the other hand, in *Trimble* the Court rejected the purported interest in promoting family relationships by means of laws that discriminate against illegitimate children. *Trimble v. Gordon*, 430 U.S. at 769, 97 S.Ct. at 1464. As the Court declared, "we have expressly considered and rejected the argument that a State may attempt to influence the actions of men and women by imposing sanctions on the children born of their illegitimate relationships." *Id.*[18]

Turning to the question of appropriate means, it appears the constitutional requirement lies somewhere between an all-out exclusion of illegitimates from inheriting intestate, and a case-by-case determination of paternity. *See Trimble v. Gordon*, 430 U.S. at 770–71, 97 S.Ct. at 1465–66. In

---

18. In *Trimble* the court acknowledged that the Illinois law also fostered the legitimate state purpose of maintaining an efficient means of disposing of property at death. 430 U.S. at 770, 97 S.Ct. at 1465. Nevertheless the statute's legitimate purpose was too closely tied to its illegitimate purpose of promoting families by means of punishing kids, and so the Court declared the law unconstitutional as overbroad. *Id.* at 772–73, 97 S.Ct. at 1466.

*Trimble*, the Illinois law required both the marriage of the father and mother, and the father's acknowledgment of paternity, as an absolute precondition to inheritance by illegitimates. The Court declared the Illinois law unconstitutional because the means adopted excluded "significant categories of illegitimate children of intestate men" whose inheritance rights could have been recognized without jeopardizing the legitimate state interest in the orderly disposition of property at death. *Id.* at 771, 97 S.Ct. at 1465. Noting that the illegitimate child in that case had been declared the daughter of the deceased father in a state court paternity action prior to his death, the Court declared that such adjudication was sufficient to vindicate the state's interest in efficiently disposing of property at death and avoiding spurious claims. *Id.* at 772, 97 S.Ct. at 1466. Thus in *Lalli*, the Court upheld the constitutionality of a New York state intestacy law granting full inheritance rights to illegitimate children upon fulfillment of the sole evidentiary requirement that the paternity of the father be declared in a judicial proceeding prior to his death.[19] *Lalli v. Lalli*, 439 U.S. at 271, 275–76, 99 S.Ct. at 526, 528–29. The Court characterized the means employed in New York as achieving an appropriate balance between both the father and the child's individual interests in the estate and the state's more general interest in effective probate administration. *Id.* at 273, 99 S.Ct. at 527.

 Reading *Trimble* and *Lalli* in tandem, it appears that an appropriate application of the prescribed constitutional test involves a balancing of the various state and individual interests affected. *See Lalli v. Lalli*, 439 U.S. at 274, 99 S.Ct. at 527 (New York law represents careful balancing of various interests). The test is, to be sure, by its terms a means-ends analysis. But to determine at what point a particular means fails to adequately protect the interests of an illegitimate child and instead begins to unnecessarily exclude "significant categories of children," the court must weigh the substantiality of the asserted state interest in evidentiary accuracy against the illegitimate child's desire to inherit on a par with legitimate children, keeping in mind the interests of the purported father in protecting his estate and reputation from spurious claims. The Court in *Lalli* discussed each of these factors in determining that New York's inheritance law was substantially related to the state's interest in efficient property disposition. *Lalli v. Lalli*, 439 U.S. at 268–271, 99 S.Ct. at 524–526. In *Trimble*, the Court determined that the fit between the state's purpose in promoting family relationships and the means of requiring marriage and paternal acknowledgment as a precondition to inheritance was not close enough to justify excluding so many illegitimate children from inheriting. The determination clearly followed from the Court's weighing the importance of not victimizing blameless children relative to the value of promoting family relationships by means of state inheritance laws. *See Trimble v. Gordon*, 430 U.S. at 768–70, 97 S.Ct. at 1464–65. Likewise, with respect to the state's interest in promoting an efficient system of property disposition, the Court held that "[d]ifficulties of proving paternity in some situations do not justify the total statutory disinheritance of illegitimate children whose fathers

---

19. The New York law also required that the proceeding for the order of filiation be commenced during the pregnancy of the mother or within two years of the birth of the child. Noting that the New York Court of Appeals had not passed upon the constitutionality of the two-year restriction, the Court refused to rule on the issue because it was not before them. *Lalli v. Lalli*, 439 U.S. 259, 267 n.5, 99 S.Ct. 518, 524 n.5, 58 L.Ed.2d 503 (1978).

In a subsequent case, the Court has in fact held that the period of time during which an order of paternity will serve to establish rights of support must be of sufficient duration to present a reasonable opportunity for interested persons to assert their claims. *Mills v. Hubluetzel* [—— U.S. ——, 102 S.Ct. 1549, 71 L.Ed.2d 770] (1982) (declaring unconstitutional a Texas law requiring that paternity suit be brought before a child reaches age of one year). Although it was not made explicit, the Court appears to intend that this rule be applied to state laws affecting the inheritance rights of illegitimate children. *See id.* at [——, 102 S.Ct. at 1554 n.5] (factual differences between inheritance rights cases and support rights case do not call for a variance of the general principles of equal protection doctrine).

die intestate." *Id.* at 772, 97 S.Ct. at 1466. In sum, it appears the state can, for the evidentiary purpose of ascertaining paternity, maintain some system of property disposition that excludes illegitimates from inheritance rights, but it must tailor its system to accommodate the greatest inclusivity reasonably possible.

One other value looms paramount in these cases. The results in the two cases highlight the importance of allowing the illegitimate child to have some control over the means by which he or she is rendered legitimate as against the purported father's ability to control this process. In *Trimble*, the father was in complete control, without whose acknowledgment of paternity an illegitimate child could never be rendered legitimate. By contrast, the statute in *Lalli* protected to some extent the interests of the child by allowing someone other than the purported father to at least initiate the legitimation process. Although the Court in *Lalli* did not explicitly distinguish *Trimble* on this basis, it did acknowledge the importance of protecting the illegitimate child's interests. As such, the distinction is certainly consistent with the reasoning in the two cases.[20]

B

■ We now turn to the specific state laws before us in this case. In 1977 at the time of the plaintiff's application for benefits, Georgia law excluded illegitimate children from inheriting from the father. Ga. Code Ann. § 113–904 (1975). An illegitimate child could be legitimated by one of two alternative methods. Under section 74–101, the child would be rendered legitimate if the parents married and the father acknowledged paternity of the child. Ga. Code Ann. § 74–101 (1981). This statute is essentially identical to the statute in *Trimble*, and so we now declare it unconstitutional without further discussion.

■ In the alternative, section 74–103 of the Georgia Code provided that a child could be rendered legitimate if the father obtained from the superior court an order of legitimation. Ga.Code Ann. § 74–103. Georgia case law is noticeably quiet on the interpretation of this statute and its legislative history. In *Hicks v. Smith*, 94 Ga. 809, 22 S.E. 153 (1895), a case involving the interpretation of a will, the Georgia Supreme Court had an opportunity to discuss the purpose of this statute. The court alluded to several legislative objectives, including expanding the rights of illegitimate children, and enabling the reputed father "to make reparation for the wrong he had done the unfortunate and innocent offspring of his lustful desire." *Id.* at 814, 22 S.E. 153. We must assume in addition that when the legislature decided to expand the rights of illegitimates, it was cognizant of the evidentiary problems of establishing paternity and took this factor into account in constructing the statute.

As previously indicated, the relevant constitutional inquiry focuses on the range of individual and public interests at stake. Georgia's requirement that the purported father obtain a judicial order of legitimation would no doubt vindicate the state's interest in avoiding a case-by-case determination of paternity for all illegitimates claiming rights of inheritance. And at least as compared with the law of Georgia prior to the enactment of section 74–103 in 1850,

---

**20.** Of course it might be argued that the element of control is not a crucial distinction since, in one sense, the father has complete control over inheritance disposition anyway by virtue of his testamentary capacity. If control were so important, one might wonder why the Court has not struck down all probate laws giving the father absolute testamentary powers. But the point cuts too far. Fathers in Illinois could by means of testamentary disinheritance conceivably exclude all children, including illegitimates, from inheriting. The Court nevertheless emphasized that the constitutional flaw in Illinois' inheritance law for illegitimate children was its unreasonable exclusion of too many kids. *See Trimble v. Gordon*, 430 U.S. at 771, 97 S.Ct. at 1465. The Court has not of course struck down probate laws giving fathers a right to disinherit their kids, but on the other hand it appears the Court wants to protect the right of an illegitimate child to render him or herself eligible to inherit in the absence of any will. This makes more sense once it is recognized that a child values legitimation not only for inheritance purposes, but also for purposes of support and reputation in society.

it certainly accomplished the noble objective of expanding the rights of illegitimates. Prior to that time there was no inheritance right, either statutory or at common law, granted to illegitimate children. Finally, the statute conveys the suggestion that the father is making amends for his past "wrongdoing" ("carelessness" might be a more appropriate word in these times) because it places the burden upon him to take the initiative in obtaining an order of legitimation.

It is this last aspect of the Act, however, that is constitutionally flawed. Section 74–103, like the Illinois statute in *Trimble*, leaves the first step in the process of legitimation to the absolute discretionary control of the purported father. Doubtless there have been many responsible fathers who have, to indulge the Georgia Supreme Court, "made reparation" for their past irresponsibility by obtaining an order of legitimation and bringing their otherwise illegitimate children into the mainstream of inheritable American life. But the all too sad story of the unwed father who flees his partner, his illegitimate child, and his responsibilities to both, is, unfortunately, all too frequently told and retold. There exist countless such situations in which, under the law of Georgia as set out in section 74–103, the hapless illegitimate child and his or her mother are left helpless in being able to have determined at their own request the child's paternity either for support purposes or for purposes of inheritance.

The State of Georgia could nevertheless protect its own interests in having an accurate system of proving paternity without excluding all such children. It could allow the illegitimate child, or the mother on behalf of the child, to bring on their own initiation a suit for establishing paternity, as allowed by the New York law described in *Lalli*. Only in this way can it be said that the state has reasonably taken into account the child's interest in not being totally dependent upon the all-too-often undependable father to be rendered legitimate. Because the State of Georgia failed to give sufficient weight to the illegitimate child's interests, we must hold section 74–

103 unconstitutional under the principles enunciated by the United States Supreme Court in recent cases.

That Georgia's interest in evidentiary accuracy can be satisfied without giving complete control to the father is evidenced by the fact that Georgia law does allow a court to determine paternity if necessary in a suit brought by an illegitimate child or the mother of such child for purposes of obtaining rights of support. *See* Ga.Code Ann. §§ 99–917 b, 99–922 a.1 (1981). Evidentiary accuracy is no less important in a suit for support than in a suit for legitimation and inheritance rights. The Georgia law of support thus belies any assertion that its interests can not be sufficiently guarded by any illegitimate inheritance statute other than section 74–103.

The unnecessary exclusion of illegitimate children under Georgia law is evidenced by the facts in this case. James Appling, the purported father, openly acknowledged Michael Cox as his son. Indeed, it appears from the record that everyone knew of this fact, including reporters from a local newspaper. The ALJ himself admitted that the question of paternity was satisfactorily answered in the facts of record. And yet for reasons not elicited from the record, Appling failed to legitimate his son in accordance with section 74–103. Had Georgia made available to the plaintiff and her illegitimate child in 1977 a procedure whereby they might have sought on their own an order of legitimation, it appears beyond doubt that such order would have been issued directly.

Georgia's requirement that the father initiate the legitimation proceedings served no additional evidentiary purpose that a similar procedure allowing the mother to initiate would not have served. But the law did exclude Michael and his mother from exerting some control over the child's rights of inheritance, and because it did, it is unconstitutional.

The result reached in this case comes only after the resolution of a multitude of interconnected steps. Despite the complexities involved, common sensibilities nevertheless break down under the strained

logic of a different result. In essence, Michael Cox was denied entitlement to survivor's benefits on the basis of a clearly unconstitutional state intestacy law. Were we to affirm this denial simply because the Georgia legislature passed a new law during the pendency of this litigation, or because the state law is in reality a federal law by incorporation, we would be hard put to ground our decision in anything but ad hoc reasoning. Had the Georgia law in 1977 fit the constitutional prescription set out in the *Lalli* case, there is every reason to believe that a court would have declared Michael the son of James Appling. And had this been done, Michael's application for survivor's benefits would never have been denied. The only reason for it not having been done being an unconstitutional one, we are bound to eradicate the constitutional flaw. Once eradicated, Michael's right to inherit, and therefore his right to benefits, are beyond question.

REVERSED and REMANDED.